CADER BARFIELD v. THE STATE.

No. 14131.   Delivered June 10, 1931.
Rehearing Denied November 18, 1931.

The opinion states the case.

*Carney & Carney* and *O'Neal & Harper,* all of Atlanta, *R. T. Wilkinson, Jr.,* of Mt. Vernon, and *W. E. Rabb,* of Atlanta, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

LATTIMORE, JUDGE.—Conviction for murder; punishment, five years in the penitentiary.

This is the second appeal of this case. See Barfield v. State, 113 Texas Crim. Rep., 276, 21 S. W. (2d) 673.

The first point complained of in appellant's brief is the overruling of his application for a continuance. Since the case was reversed upon the former appeal for the refusal of a continuance, it must be manifest that the application made at the instant term of the court below was not a first application, and it must be treated as a subsequent application. As far as we can judge practically all the testimony expected from appellant's sister, one of the absent witnesses, was given by his wife. The only difference appears to be the claim that the absent witness would have sworn that when she reached deceased shortly after the shooting he said in her presence: "Oh Lord, forgive me and forgive Cader, too, for I know he did not intend to do it." Upon the former trial of this case this witness was present and gave this testimony before the jury, as the records of this office reveal, and he was then awarded a term of thirty-five years in the penitentiary. Upon this trial he was given a term of five years. We are not led to attach the importance or materiality to this testimony of the absent witness which is ascribed to same by appellant's counsel. Nor do we think the trial court exceded the discretion confided in him when evidently upon consideration of the motion for new trial, he concluded that had the absent testimony been before the jury a different result would likely not. have followed. Wiley v. State, 117 Texas Crim. Rep., 459, 36 S. W. (2d) 495.

As making evident the correctness of our conclusion that the trial court did not abuse his discretion in this matter, attention is called to the immediate facts surrounding the killing, which show that following a fight or several fights between deceased and appellant the latter went away, got a pistol and at once returned to the scene, went upstairs, passed his wife, and went into a room in which he says deceased was alone, the latter lying on a cot. Giving appellant's own version of what then occurred, he said deceased got up, and that he shot to turn deceased back, —shot over his head; that he dropped the pistol down and shot again, and then shot a third time. Deceased said: "Don't shoot me any more." Appellant said that he shot because he thought deceased was fixing to finish him. He did not claim to have seen deceased with a pistol, nor did the latter make any motion as if to draw one, nor is his description of the situation such as to make it apparent that deceased was within reach of him if he intended to use any other weapon, or that they were nearer than across the room from each other. The mother of deceased testified for the state that she was in the room when appellant shot three times, and that deceased was lying on a cot, and at no time got up, except that he rolled off the cot when appellant shot the third time, and

said "Oh mamma, he has killed me". Mrs. Jones swore for the state that when appellant came back with the pistol she saw same and tried to keep him from coming in. She said appellant's wife also tried to prevent him from coming in. They got hold of appellant and he shoved them away. They swung on to him trying to hold him. Witness said she held on to him until he got half way across the room. According to her statement, appellant told them to get out of his way, he was going to kill him. She said the mother of deceased was right by appellant while the latter was doing the shooting. Another witness swore that when appellant came back with the pistol she and a young man were trying to push a car. Appellant said something about their trying to take deceased away in that car. Appellant had a pistol in his hand and came and snapped on the light and pointed his pistol over the door of the car. When he discovered deceased was not in the car, he went on upstairs, and witness holloed that "Cader was coming with a gun." When he had time to get upstairs she heard the shots. We fail to see how the testimony of the other absent witness, Mr. White, relating solely to the burglary of his store some ten days prior to this homicide, could be of such materiality as to require the granting of a new trial. We are of opinion the court did not err in refusing the application for continuance.

We find nothing in Greever v. State, 114 Texas Crim. Rep., 99, 24 S. W. (2d) 1093, or Williams v. State, 74 Texas Crim. Rep., 56, 166 S. W., 1170, which would support the objection to the testimony of the mother of deceased, who said that just before appellant came into the room where deceased was and began shooting she heard Vivian Jones downstairs hollo, "Here comes Cader with a gun." This was part of the res gestae of the transaction. Cader was coming with a gun. At that time he was somewhere between the girl who called out and the room upstairs where the shooting took place almost immediately afterward.

We find nothing in appellant's testimony supporting the theory of negligent homicide. The court gave a special charge, in effect, that if appellant did not shoot at deceased, but fired his pistol to deter deceased from attacking him, and that if the bullet from said pistol struck some object and was deflected and struck deceased without intent on appellant's part to shoot deceased, and that the killing resulted from such shooting, they should acquit.

As part of his charge on the law of threats, the court told the jury that if deceased did no act and made no demonstration, or used no language coupled with acts or demonstrations reasonably indicating or inducing in the mind of appellant a belief, viewed from his standpoint, that a threatened attack had been commenced, then appellant could not justify on the ground of threats. We fail to perceive any error in this part of the charge.

All the other matters brought forward in the brief and complained of in the record, have been examined and in none of same do we believe there appears any error for which the case should be reversed.

The judgment will be affirmed.

*Affirmed.*

### ON MOTION FOR REHEARING.

HAWKINS, JUDGE.—Appellant insists that the trial court committed error in not charging on negligent homicide, and that we were wrong in our original opinion in holding that such theory was not supported by the testimony. As touching the point raised we again summarize the evidence as we understand it. .

Appellant and deceased appear to have met upon the day of the homicide by accident. The difficulty between them was occasioned by appellant having reported that deceased had burglarized a store, or, at least, that deceased believed appellant had made such report. The wife and sister of appellant had gone to the home of a relative on the Sunday evening on which the homicide occurred, and appellant seems to have gone there for the purpose of returning home with his wife and sister. He found deceased at the house. Soon after appellant entered deceased referred to him as that "snitching s— of a b—," whereupon appellant slapped him. A fight ensued, the details of which are not altogether agreed upon by witnesses for the state and appellant. Appellant claimed that deceased struck him with brass knucks, knocked him down, then "stomped" him in the side. This was denied by the state's witnesses. At any rate, appellant was worsted in the fight and was considerably bruised and bleeding as a result thereof. He left the house, saying, according to the state's witnesses, that "he was going to get a gun and return and kill the s— of a b—." This statement attributed to him by the state's witnesses was denied by him and his witnesses. He secured a pistol and did return in about ten minutes, and apparently thought deceased was being taken away in a car which was in front of the house. He turned the lights on in the car and made inquiry about deceased, having the pistol presented in the car at the time. He then went immediately upstairs to the apartment where the fight had occurred, and into the room where deceased was lying on a cot. He fired three shots. It is agreed by all parties that the first shot was fired into the ceiling; it therefore, could not have been the one that struck deceased. It is also agreed that the second shot was fired down towards the floor. The direction of those two shots is accounted for by the state's witnesses upon the ground that they were holding appellant and undertaking to take the pistol away from him, to prevent him from shooting deceased. On the other hand, appellant claims that no one was holding him and that he fired the first shot in the ceiling and the second one towards the floor to deter deceased from continuing to advance upon him. Appellant says he does not know

where he fired the third shot. The theory of negligent homicide is built around the proposition that the second shot struck a stool; that the course of the bullet was deflected and struck deceased. It was the theory of the state that this deflected bullet did not strike deceased, but struck the wall some five or six feet above the floor, and that the third shot struck deceased while he was lying on the cot, went through his body, through the cot, and struck the door facing some eight inches above the floor. Two state's witnesses testified that this bullet had blood on it. On this trial the state introduced as an admission against him the testimony of appellant given upon another trial, in which he then said, "No. The second bullet did not hit him. It was the third one." We still express doubt whether under the facts the issue of negligent homicide was raised. The failure of the court to charge upon that subject was complained of by exception to the court's charge only, no special instruction being asked upon the subject. We mention this in view of the special charge appellant did request. At his instance the court gave the following special instruction. "You are further instructed that if you believe from the evidence that if the deceased was struck by a bullet from the defendant's gun, but you further believe that the defendant did not shoot at deceased but fired his gun to deter deceased from attacking him, the defendant, and that in so firing his said gun, the bullet therefrom struck another object and was deflected from its course and thereby struck the deceased, without intent on the part of defendant to shoot the deceased, and that the same was an unavoidable accident, or if you have a reasonable doubt thereof, you will acquit the defendant and say by your verdict, not guilty.' "

In the foregoing instruction is contained the elements of negligent homicide, save that the shot was fired carelessly or negligently, and that there was apparent danger of causing the death of deceased. If the jury had believed that appellant did not shoot at deceased, but that the bullet which killed him struck another object and was deflected from its course and thus caused to hit him without intent on the part of appellant to kill, it would have been the duty of the jury under the instruction given to have acquitted appellant. They found against appellant on some of the indispensable issues which would have been presented in a correct charge on negligent homicide.

"Negligent homicide" consists in the doing of an act, lawful or unlawful, in a careless or negligent manner, when there is apparent danger of causing the death of the person killed or some other, but with no apparent intention to kill. P. C., arts. 1230-1235. The instruction given the jury at the request of appellant omitted the elements of "apparent danger" necessary in negligent homicide, but authorized an acquittal, although the act of firing might have been due to the negligence of appellant, and upon the facts was more favorable to the accused than would

have been a charge on negligent homicide. With the instructions given the jury at the request of appellant before them, an instruction upon the law of negligent homicide would have necessarily been contradictory and confusing for the reason that the instruction upon negligent homicide would have informed the jury in effect that though the death of the deceased was brought about by accident, it would, nevertheless, have been criminal if there was "apparent danger" of killing the deceased. As stated above, the propriety of a charge on negligent homicide on the facts, would, in any event, be a matter of extreme doubt; but having given the charge quoted above, no doubt is entertained that reversible error was not committed in the refusal to instruct the jury on the law of negligent homicide. Reference is made by appellant to the Mitchell case, 36 Texas Crim. Rep., 278, and others, illustrative of the well-established principle that in the case of an assault, as in other cases, issues formed by the evidence, can not, over objection, be ignored in the charge. The principle is perfectly sound and has often been given application. Whether the facts in a given case are such as bring the principle into operation is a matter upon which minds may differ. Schrimscher v. State, 36 Texas Crim. Rep., 461. It is not believed, however, that the facts in the present instance bring it into operation. Even if that be doubtful, the instruction given the jury at the behest of appellant being, in the opinion of the court, fully adequate to protect his rights, a reversal of the judgment would not be justified. It is not every inaccurate charge that would demand a reversal. Such was the announcement of this court at a time when there was a statute which declared that an error in the charge to which exception was made required a reversal. Notwithstanding such statute, the court uniformly held that if there was no exception at the time of the trial, there should be no reversal unless the error was calculated to injure the rights of the accused. See Tuller v. State, 8 Texas App., 501; Bishop v. State, 43 Texas Crim. Rep., 390. The principle mentioned has since been embraced in the statute. Article 66, C. C. P., which has often been given effect in the decisions of this court. See Davis v. State, 107 Texas Crim. Rep., 397, for an example. Requested instructions have long been regarded as of weight in testing the sufficiency of the charge of the court given to the jury. See Moxie v. State, 54 Texas Crim. Rep., 529. It seems manifest that the charge written by appellant's counsel and given to the jury would have been incompatible with the charge on negligent homicide. In a charge on negligent homicide, one of the principal questions would be whether there was an intent to kill. The appellant, having in his special charge invited the court to submit that issue in the manner in which it was submitted, cannot reasonably complain of the failure to submit it in a different form. Such is the announcement in many decisions cited by Mr. Branch in his Ann. Tex. P. C., sec. 1946, among them the following: Hall v. State,

28 Texas App., 146; Carbough v. State, 49 Texas Crim. Rep., 453.

The other point urged by appellant in his motion for rehearing is that the court should have granted a continuance or a new trial based upon his refusal of continuance.

In a further careful review of the facts we have had this contention of appellant in mind. We cannot bring ourselves to believe that under the whole case the trial court can be said to have abused his discretion in overruling the motion for new trial based upon his refusal to grant the continuance. This subject was discussed at length in the recent case of Wiley v. State, 117 Texas Crim. Rep., 449, 36 S. W. (2d) 495, and many of the older cases were reviewed and cited. We cannot believe it reasonably probable that if the absent testimony had been before the jury a verdict more favorable to appellant would have resulted.

The motion for rehearing is overruled.

*Overruled.*